**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MANSFIELD OIL COMPANY OF GAINESVILLE, INC., | : | |
| Plaintiff, | : | |
| v. | : | Civil Action No. 2:26-cv-06072-GAM |
| KRSM INC. and SYED KAZMI, | : | |
| Defendants. | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT KRSM INC.'S MOTION TO QUASH THIRD-PARTY SUBPOENAS, IMPOSE PROPOSED PROTECTIVE ORDER AND AWARD SANCTIONS (ECF NO. 51)**

Plaintiff Mansfield Oil Company of Gainesville, Inc. ("Mansfield") respectfully submits this Memorandum in Opposition to the Motion to Quash Third-Party Subpoenas, Impose Proposed Protective Order and Award Sanctions filed by Defendant KRSM Inc. ("KRSM") on September 22, 2026 (ECF No. 51, the "Motion").

## I. PRELIMINARY STATEMENT

The Motion should be denied at the threshold for a reason that disposes of nearly everything in it: its central factual premise is false. Defense counsel tells the Court that Plaintiff "issued" the seven subpoenas "on September 17, 2026 and served [them] on September 18, 2026" (Mot. at 1), that Plaintiff "served all seven subpoenas that same day, before the parties met and conferred" (Mot. at 7), and, in its Certificate of Conferral, that "Plaintiff ha[s] served the subpoenas notwithstanding KRSM's request that service be held." None of that happened. **Not one of the September 17 subpoenas has been served on any recipient, not on September 18, and not as of September 28, 2026**. (Furrer Decl. ¶ 4; Santarelli Decl. ¶¶ 3, 12.) There are no proofs of service because there was no service; the Motion cites none. The statement the Motion falsely brands an

alleged "misrepresentation," the September 18, 9:54 a.m. confirmation that the subpoenas "have not been served and are not in the process of being served" (Defs.' Ex. D, ECF No. 51-1 at 62), which was true when made, in direct response to a question defense counsel had posed two minutes earlier, and it remains true as of September 28, 2026.

Indeed, KRSM's own Exhibit F, Mr. Toner's letter of September 21, the day before this Motion was filed, admits as much: it acknowledges "your confirmation that the subpoenas have not been served," declares that the parties were "in exactly the interval Rule 45(a)(4) was written to create," and asks Plaintiff to "hold service of the subpoenas through October 2, 2026, while we confer." (Defs.' Ex. F, ECF No. 51-1 at 88.) The Motion filed the next morning told the Court the opposite. KRSM has moved to quash subpoenas that command nothing of anyone, and it seeks sanctions for a "service" that never occurred, an accusation it lodged without evidence, contrary to its own Exhibit F, and the day after Plaintiff's counsel discussed the not-yet-served subpoenas with Mr. Toner in their September 21 conference. (Santarelli Decl. ¶¶ 6–7.)

What Defendants received on September 17, 2026 was precisely what Rule 45(a)(4) guarantees a party: a formal notice letter and complete copies of all seven subpoenas and their Schedules A, served on every defense counsel of record **before** service on any recipient. Because Plaintiff received the formal notice letter and complete copies of all seven subpoenas and their Schedules A on Friday, September 18, 2026 and, as of September 28, 2026, none of the Subpoenas had been served, Defendants have now enjoyed something the Rule does not even require — several days of pre-service opportunity to object, culminating in this fully briefed motion, all before a single recipient has been commanded to do anything. The procedural grievance at the heart of the Motion refutes itself.

Nor was Plaintiff's position any secret. Plaintiff's counsel set it out for Defendants in

writing: the subpoenas were fully noticed; nothing in the Rules conditions service of a third-party subpoena on an adversary's consent; and the Court's schedule required the parties to "get the discovery process moving so there are no needless delays." That writing closed with an open invitation — "by all means if you want to talk in the meantime, feel free to call my office or on cell . . . I'm here all day and don't mind you calling over [the] weekend either." (Defs.' Ex. E, ECF No. 51-1 at 74.) No call came that Friday, and none came over the weekend. (Santarelli Decl. ¶¶ 5–7.) The call that did occur, the parties' meet-and-confer, advanced to Monday afternoon, proceeded on the shared understanding that the subpoenas had not been served. What came the next day was this Motion.

Moreover, the Motion fares no better on its merits, for three independent reasons. First is the issue of standing: KRSM, the sole movant, may challenge a subpoena directed to another person only to vindicate its *own* privilege or personal right. '"Ordinarily a party has no standing to seek to quash a subpoena issued to someone who is not a party to the action, unless the objecting party claims some personal right or privilege with regard to the documents sought.'" *Talentscale, Inc. v. Aery Aviation, LLC*, 802 F. Supp. 3d 1370, 1380, (N.D. Fla. 2025) (quoting 9A Charles Alan Wright & Arthur R. Miller, Federal Practice And Procedure § 2459 at 435 (3d ed. 2008)).

Simply stated, KRSM has no standing to litigate undue burden, confidentiality, or "trade secrets" on behalf of a national bank, two motor carriers, and four corporations, none of which has objected or sought relief. Indeed, KRSM's own lead authority, *Talentscale, Inc. v. Aery Aviation, LLC*, 802 F. Supp. 3d 1370 (N.D. Fla. Oct. 6, 2025), **denied** the debtor's motion on exactly that ground, holding the debtor lacked standing to shield a non-party's non-privileged financial information, holding that defendant did "not have standing to obtain a protective order to preclude

its judgment creditor from obtaining non-privileged financial information regarding one of [its] members." *Id*. at 1381

Second, the Motion asks the Court to treat this case as "a suit whose sole dispute is over the price of fuel" (Mot. at 2), ignoring the findings this Court made from the bench on August 27. The Court found the likelihood of success "high"; that "the maximum amount in dispute is 1 million dollars" of the $3.998 million claimed, such that the Court could not "see any universe in which" Mansfield "does not prevail"; that, by a preponderance of the evidence, "a substantial quantity, or at least a meaningful quantity" of the fuel "went to ... gas stations operated by or affiliated with the defendant," which "have already realized a benefit"; that "tankers dispatched by [Mr. Kazmi], or his brother, or affiliated entities were tapping very substantial amounts of gasoline"; and that Mansfield holds an equitable interest in the M&T account, which faces a "genuine risk" of "execution by other creditors" given "other judgments which have already been entered against the defendant." (Hr'g Tr. 168–74.) The subpoenas trace exactly what the Court described: the fuel, from the terminal rack to the affiliated stations where it was resold; the proceeds, through the designated account and the affiliated entities; and the account's true titleholder. That is merits discovery under Rule 26(b)(1), on the pleaded conversion and unjust-enrichment claims, on KRSM's own invoice-accuracy defense, and on enforcement of the Court's injunction; *Grupo Mexicano* has nothing to say about it: that was a remedies decision, and this Court has already held, applying *Deckert* and *Hoxworth*, that this case "falls within the exception to" it. (Hr'g Tr. 173.)

Third, the privilege objection targets discovery into the provenance of documents that the sworn record has already placed outside any privilege: Mr. Gossett testified that the August 10, 2026 letter sent over his name was drafted by Shamikh Kazmi, a man Mr. Gossett "assum[ed]" to

be an attorney but who, as counsel asked the Court to judicially notice and as the Court observed on the record, "is not an attorney, at least, in New Jersey or Pennsylvania," that Mr. Gossett never reviewed the invoices, could not "certify any of the facts" of the letter, and did not prepare the notice of appearance "electronically filed through [his] account" bearing a telephone number and email address that are not his. (Hr'g Tr. 131, 133–35, 139–41.) Identity of drafters, engagement and payment records, and ECF-access records are not privileged; disclosure to a non-client destroys confidentiality; and blanket privilege assertions carry no weight, least of all here, where no affidavit identifies the attorney whose advice, or the client whose confidence, the assertion supposedly protects. Further Defendants themselves proffered the August 10, 2026 letters as the corporation's "detailed objection" on the merits (Hr'g Tr. 139); having made the letters' contents their defense, they cannot shield the letters' acknowledged author, a fact witness in possession of the facts on which those defenses rest, behind a privilege Defendants have not established.

Finally, the Motion should be recognized for what it is. Discovery in this case closes on January 4, 2027, under a Scheduling Order to which the Court appended a pointed footnote: "The Court can discern no reason to stage or limit discovery." (ECF No. 46 at 1 & n.1.) That footnote was not boilerplate. It was entered upon review of the parties' Joint Rule 26(f) Report (ECF No. 42), in which Defendants asked the Court to define, "under Rule 16(b)(3)(B)(ii)," categories placed "outside the scope of merits discovery," including the accounts, ownership and corporate structure of non-parties "affiliated with Defendants"; Defendants' "downstream customer, supplier, vendor and carrier identities, relationships, receipts, payments, resale proceeds and delivery destinations"; and "[a] general tracing of funds among Defendants and persons or entities related to them" (ECF No. 42 at 11–12), while Plaintiff's portion of the same Report told the Court in terms that its "[d]iscovery will cover tracing the fuel and money," including discovery from the trucking

companies and the parties to whom the fuel was delivered (*Id*. at 7). The Court read both and declined to adopt Defendants' categories. The Motion, with a proposed order that would prospectively forbid whole categories of third-party discovery not yet even propounded, is an attempt to revive through motion practice the truncated-discovery regime the Court has already considered and rejected, this time built on a false factual premise and garnished with accusations against counsel that Defendants' own exhibits disprove. It should be denied in its entirety, together with its request for fees.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. The claims, the August 27 hearing, and the preliminary injunction.

Mansfield's Complaint pleads breach of contract, unjust enrichment, an action for the price under 13 Pa. C.S. § 2709, account stated, conversion, and declaratory relief, all arising from KRSM's lifting of approximately 150 loads and 1,124,594 gallons of Mansfield's fuel from the Twin Oaks terminal between May 21 and July 7, 2026, without payment. (ECF No. 1.) On August 20, 2026, the Court entered a temporary restraining order as to the M&T Bank account ending 7805, the account KRSM designated to Mansfield in the parties' Electronic Funds Transfer Authorization and identified on its 2022 credit application. (ECF No. 10; ECF No. 52-1.) On August 27, 2026, the Court held an evidentiary hearing at which four witnesses testified, including Defendants' then-counsel of record, George S. Gossett, Jr., Esq., and by Order of August 28, 2026 the Court vacated the TRO and granted Plaintiff's preliminary-injunction motions in part, ordering that "Defendants shall maintain a balance of at least $2,750,000" in the 7805 account, with no withdrawals, transfers, or drafts at or below that balance absent Court order. (ECF No. 35.)

The Court's reasons, stated from the bench, matter here. The Court found the likelihood of success "high" because "there's no dispute that a substantial amount of money is owed," and took

defense counsel's own presentation to concede that "of the approximately 3.9 million dollars claimed ... only 1 million dollars of that is in dispute." (Hr'g Tr. 168–69.) Further, the Court found a cognizable equitable claim, unjust enrichment, with a "very specific nexus" to the 7805 account, because the credit application and EFT authorization obligated KRSM to "maintain its checking account with sufficient sums" to cover its terminal liftings. (Hr'g Tr. 169–71.) The Court found, "by a preponderance of the evidence[,] that among the fuel lifted from the terminal, a substantial quantity — or at least a meaningful quantity went to . . . gas stations operated by or affiliated with the defendant in this case. So they have already realized a benefit." (Hr'g Tr. 170.) It observed that "tankers dispatched by [Mr. Kazmi], or his brother, or affiliated entities were tapping very substantial amounts of gasoline for a sustained period of time." (Hr'g Tr. 171.) It concluded that "the maximum amount in dispute is 1 million dollars," so that it could not "see any universe in which . . . the plaintiff here does not prevail." (Hr'g Tr. 172.) It held that the case "falls within the exception to Grupo de Mexico," citing *Deckert* and the Third Circuit's decision in *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186 (3d Cir. 1990). (Hr'g Tr. 173.) And it found irreparable harm, citing *Tanimura & Antle, Inc.*, 222 F.3d 132, because dissipation would likely make recovery impossible, noting "evidence that there are other judgments which have already been entered against the defendant" and a "genuine risk that this M&T account would be subject to execution by other creditors," the account being one in which "plaintiff[] ha[s] an equitable interest." (Hr'g Tr. 173–74.)

**B. The shortfall, the pending contempt motion, and Defendants' own financial statements.**

On August 31, 2026, M&T Bank confirmed in writing that the 7805 account held $589,513.68, or $2,160,486.32 below the Court-ordered floor, with no deposits since entry of the injunction. On September 1, 2026, Plaintiff moved for an order to show cause why Defendants

should not be held in civil contempt; among the relief sought is a sworn accounting of Defendants' accounts and transfers since May 21, 2026. (ECF No. 37.) That motion remains pending. The consolidated financial statement KRSM itself submitted to Mansfield, admitted at the hearing as Exhibit 3, reported total assets of $59,306,958 and cash on hand of approximately $30.9 million as of December 2023. (Hr'g Tr. 37, 40.) M&T Bank has further advised that the 7805 account, the account KRSM promised would stand behind its liftings, is titled to an entity that is not a party to this action. (Furrer Decl. ¶ 8.) Where the money went, and where the fuel went, are accordingly live questions at the center of this case right now, for the conversion and unjust-enrichment claims, for the contempt record, and for the fraudulent-transfer claim it added to its First Amended Compliant(ECF No. 52), not questions reserved for some hypothetical judgment creditor.

**C. The sworn record concerning the provenance of Defendants' correspondence and filings.**

Called by the defense at the August 27 hearing, Mr. Gossett testified that he "represent[s] the brother, Mr. Kazmi — Shamikh Kazmi," and that the detailed August 10 objection letter sent to Mansfield over his name "was drafted by Mr. [Shamikh] Kazmi, who ... also is an attorney and works with me." (Hr'g Tr. 130–31.) Asked where Shamikh Kazmi is admitted, Mr. Gossett answered, "I believe he's admitted in New Jersey." (Hr'g Tr. 133.) Plaintiff's counsel then asked the Court to take judicial notice that Shamikh Kazmi is listed as an attorney on neither the New Jersey Supreme Court's roll nor Pennsylvania's (Hr'g Tr. 139), and the Court put the point to the witness directly: the letter's drafter was the "brother, whom you were assuming as an attorney, but whom I'm told ... is not an attorney, at least, in New Jersey or Pennsylvania." Mr. Gossett: "Correct." (Hr'g Tr. 140.) Mr. Gossett further testified that he never reviewed the invoices, "can't certify any of the facts of ... the letter," reviewed with the drafter only "a general overview ... but in terms of the actual particulars of it no," and did not prepare the notice of appearance that "was

electronically filed through my account," a filing bearing a telephone number and email that, he confirmed, were not his. (Hr'g Tr. 133–35, 141.) The "legal" e-mail address used for the correspondence, legal@upssites.com, is on the same domain as the accounting address KRSM supplied on its own credit application (accounting@upssites.com), a domain associated with subpoena recipient Universal Property Services, Inc. (Furrer Decl. ¶ 9.) Defendants' own Exhibit A supplies further corroboration: Mr. Toner's September 16 demand e-mail to Plaintiff's counsel was blind-copied to "Kazmi" at sk@upssites.com, the same non-party domain. (Defs.' Ex. A, ECF No. 51-1 at 1.) These are not Plaintiff's characterizations; they are the sworn record, and yet now, Defendants object to the subpoenas arguing that the documents requested are somehow "privileged."

**D. The scheduling order, the subpoenas, and the Rule 45(a)(4) notice.**

The parties held their Rule 26(f) conference and on September 11, 2026 submitted their Joint Rule 26(f) Report. (ECF No. 42.) In it, Plaintiff disclosed the discovery program now at issue, "discovery from third parties (such as the trucking company personnel), and parties to whom the fuel was delivered, information about KRSM and Kazmi's receipt of proceeds for the Mansfield fuel, and the movement and disposition of the proceeds," summarized as "tracing the fuel and money" (*id.* at 7), and Defendants proposed a Rule 16(b)(3)(B)(ii) scope order placing outside merits discovery, among other things, the accounts and corporate structure of non-parties affiliated with Defendants, Defendants' downstream carrier and customer identities, resale proceeds and delivery destinations, and any "general tracing of funds" (*id.* at 11–12), together with a requirement of notice "seven days beyond what Rule 45(a)(4) requires" before any non-party financial subpoena (*id.* at 13).

On September 16, 2026, this Court entered its Scheduling Order: all factual discovery

closes January 4, 2027, with no "scope" order, no subpoena waiting period, and a footnote appended to the discovery deadline itself: "The Court can discern no reason to stage or limit discovery." (ECF No. 46 ¶ 1 & n.1.)

On September 11, 2026, through an oversight in coordination with local counsel, a first round of subpoenas was served on three recipients without the prior notice to parties that Rule 45(a)(4) requires. When defense counsel raised the defect on September 16, Plaintiff's counsel conceded it in writing the same day, withdrew every affected subpoena "effective immediately," committed that any material received would be sequestered unreviewed and not used, transmitted written withdrawal letters to the recipients by email and FedEx the following morning, and committed that upon re-service Defendants would "receive Rule 45(a)(4) notice, with copies, before service." (Defs.' Exs. A–B, ECF No. 51-1 at 1–5.)

And that is exactly what occurred: on September 17, 2026, Plaintiff's counsel served on all defense counsel of record a formal Rule 45(a)(4) notice letter and, by e-mail transmitted at 4:50 p.m., complete copies of all seven subpoenas with their Schedules A, directed to M&T Bank; Freedom Fuel Network LLC; Shamikh Kazmi; MR3 Logistics, LLC; Windson Trucking, LLC; Universal Group Company, Inc.; and Universal Property Services, Inc. (Defs.' Ex. C, ECF No. 51-1 at 6–61; Furrer Decl. ¶ 3.) Each Schedule A defines a "Relevant Period" of January 1, 2026 to the present unless a request states otherwise; the single earlier reach-back, to January 1, 2022, for records of the 7805 account itself, corresponds to KRSM's January 2022 designation of that account to Mansfield.

### E. September 18 through September 28: the subpoenas were not served, counsel said so truthfully, and KRSM filed this Motion anyway.

At 9:52 a.m. on Friday, September 18, Mr. Toner wrote to Plaintiff's counsel's office: "Please confirm that none of the subpoenas attached to your email sent at 4:55 yesterday have been

issued or sent for delivery." Two minutes later, at 9:54 a.m., he received exactly the confirmation he had requested: "They have not been served and are not in the process of being served." (Defs.' Ex. D, ECF No. 51-1 at 62–65; Furrer Decl. ¶ 4.) That statement was true when made and remained true through September 28, 2026 at 3:08 p.m. when the process server confirmed that **none of the seven September 17 subpoenas has been served on any recipient.** (Furrer Decl. ¶ 4.) Later that day, Plaintiff's co-counsel separately advised defense counsel in writing of Plaintiff's position going forward, that "even if they are not formally served at this time, there is no reason to delay any further in serving these third party subpoenas," given the Court's scheduling order and its stated view that there was no reason to stage or limit discovery, and that "[a]fter the subpoenas are served, we'll let you know." (Defs.' Ex. E, ECF No. 51-1 at 74–86.) No such "served" notification was ever sent, because service has not yet occurred.

On September 21, 2026, defense counsel transmitted the objections letter now filed as Exhibit F to ECF 51. That letter, written the day before this Motion, opens by acknowledging the very fact the Motion denies: "your paralegal confirmed by email dated September 18, 2026 (sent at 9:54AM) that the draft third-party subpoenas have not been sent. In light of your confirmation that the subpoenas have not been served, then we are in exactly the interval Rule 45(a)(4) was written to create." It then asks Plaintiff to "hold service of the subpoenas through October 2, 2026, while we confer," and states that if certain categories are narrowed "the balance can be served without objection." (Defs.' Ex. F, ECF No. 51-1 at 87.)

That same afternoon, Mr. Santarelli and Mr. Toner conferred by video conference. In that conference, Mr. Santarelli stated Plaintiff's position that a party's objections do not bar service of a third-party subpoena, and the discussion proceeded on the shared understanding that the subpoenas had not been served. (Santarelli Decl. ¶¶ 10–12.) Nevertheless, on September 22, 2026,

KRSM filed this Motion, asserting as fact, without any proof of service and contrary to what its counsel had been told, that all seven subpoenas had been "served on September 18, 2026." (Mot. at 1.)

## III. ARGUMENT

### A. The Motion rests on a false factual premise: no subpoena has been served, there is nothing to quash, and every theory in the Motion collapses with that premise.

Rule 45(d)(3)(A) directs a court, "[o]n timely motion," to quash or modify "a subpoena" that requires disclosure of protected matter or subjects "a person" to undue burden. The provision presupposes an operative, a served subpoena, one that commands a person to do something, on a compliance clock against which the motion's timeliness is measured. Here there is none. As of September 28, 2026, none of the seven September 17 subpoenas had been served on any recipient. (Furrer Decl. ¶ 4.) Thus, no recipient is subject to any command; no compliance date is running; and no person is burdened. The Motion asks the Court to "quash" documents that, as to every recipient, remain what they were on September 17: noticed but unserved. There is nothing for the Court to quash, and the Motion should be denied on that ground alone.

The false premise is not incidental to the Motion; it is the Motion. The assertion that Plaintiff "served" all seven subpoenas on September 18, 2026, repeated at least five times and certified in the Certificate of Conferral ("Plaintiff having served the subpoenas notwithstanding KRSM's request that service be held"), supplies (i) the ripeness of the quash request, (ii) the entire "misrepresentation" narrative, and (iii) every sanctions theory. The Motion attaches no proof of service, identifies no recipient who reported being served, and cites nothing for the assertion, because nothing exists. And the assertion was made the day after Plaintiff's counsel conferred with Mr. Toner about these not-yet-served subpoenas at which time Plaintiff's counsel and Mr. Santarelli discussed the fact that the subpoenas had not yet been served. (Santarelli Decl. ¶¶ 10–

12.) To the extent the Motion is generously re-read as a Rule 26(c) request for a protective order against anticipated subpoenas, it fails on the merits for the reasons in Parts III.B through III.E below, but the Court should be clear-eyed that what was actually filed is a motion to quash service that never happened, seeking fees for a "lie" that was never told.

The Court need not take Plaintiff's word for any of this, because KRSM's own exhibits say it. Exhibit F is Mr. Toner's letter of September 21, 2026, the day before the Motion was filed. It opens by acknowledging "your confirmation that the subpoenas have not been served"; it observes that the parties were therefore "in exactly the interval Rule 45(a)(4) was written to create"; and it asks Plaintiff to "hold service of the subpoenas through October 2, 2026, while we confer." (Defs.' Ex. F, ECF No. 51-1 at 87.) One cannot ask on Monday that service be held through October 2 and tell the Court on Tuesday that service was completed the prior Friday. The Motion's service assertion is refuted by the movant's own attachment, filed with its Motion.

**B. KRSM lacks standing to assert the interests of seven non-parties — as its own lead authority holds.**

As this Court held in *First Sealord Sur. v. Durkin & Devries Ins. Agency*, 918 F. Supp. 2d 362, 382 (E.D. Pa. 2013):

> "Ordinarily, only the non-parties whom were served with the subpoenas may move to have them quashed under Federal Rule of Civil Procedure 45(c)(3)(A)." *Davis v. General Accident Ins. Co. of America*, No. 98-4736, 1999 U.S. Dist. LEXIS 5344, 1999 WL 228944, at *2 (E.D. Pa. April 15, 1999) (citations omitted). An exception to this rule permits a party to move to quash when it "claims some personal right or privilege in respect to the subject matter of a subpoena duces tecum directed to a nonparty." Id., quoting *Dart Indus., Inc. v. Liquid Nitrogen Proc. Corp. of Cal.*, 50 F.R.D. 286, 291 (D. Del. 1970)). 10

The exception is exactly as broad as the claimed right and no broader: a party may assert its own privilege or its own personal right, for example, in records of its own bank accounts, *ITOCHU Int'l, Inc. v. Devon Robotics, LLC*, 303 F.R.D. 229, 232 (E.D. Pa. 2014), but it may not litigate undue burden, inconvenience, expense, confidentiality, or trade-secret concerns that belong

to the subpoena's recipient. See, *In re Actiq Sales & Mktg. Practices Litig.*, 2011 U.S. Dist. Lexis 130153 (W.D. Pa. 2011), '"as a general rule, a party has no standing to seek to quash a subpoena directed to a non-party" (citations omitted) [b]ut an exception exists where the party-movant can demonstrate a claim of privilege or personal right."

Rule 45(d)(3)(B), on which the Motion also relies, likewise protects "a person subject to or affected by a subpoena" claiming its own trade secrets or confidential commercial information, not a litigation adversary claiming someone else's.

Measured against that rule, nearly the entire Motion is not KRSM's to make. KRSM, the sole movant, asks the Court to suppress demands for Freedom Fuel Network's branding, dealer, and supply contracts; MR3's and Windson's carrier agreements and delivery records; Universal Group's and Universal Property Services' formation documents, ledgers, and accounts; and Shamikh Kazmi's entity and account records. None of those persons are a Defendant and none, all sophisticated commercial actors, a national bank among them, has served an objection or moved for relief. Of course they have not: they have not even been served. The recipients know how to protect their own interests when and if service occurs. Mr. Toner, for his part, confirmed at the parties' September 21 meet-and-confer that he does not represent the subpoenaed third parties and was not objecting on their behalf. (Santarelli Decl. ¶¶ 8, 10.) KRSM's motion, ostensibly made on their behalf, speaks volumes as to what those records might show.

As noted, KRSM's own lead authority disposes of its position. In *Talentscale, Inc. v. Aery Aviation, LLC*, the decision the Motion quotes for its "key that unlocks" language (Mot. at 13–14), the court **denied** the debtor's motion, holding that the debtor "does not have standing" to preclude discovery of "non-privileged financial information" regarding a non-party and "lacks standing to raise the interests of the non-party" served with the subpoena. KRSM's own motion cites a case

that rejected a motion materially identical to its own, yet does not cite it. What survives the standing bar is less than narrow: KRSM's assertion of its own privilege (Part III.E) and its personal right in records of accounts KRSM itself holds (records that are discoverable on the merits in any event, Part III.D), and everything else should be denied for lack of standing without more. Notably, this privilege would not apply to the M&T Bank account titled in the name of Universal Group Company, Inc.

Indeed, KRSM's want of standing is starkest where a party-movant might ordinarily have its strongest claim: the M&T Bank subpoena, and the personal right a party holds in its own bank records. However, the Subject Account is not KRSM's account. M&T Bank has advised that the account ending 7805 is titled to Universal Group Company, Inc., a non-party, and itself a recipient of one of the first set of seven (now withdrawn) subpoenas, which has, as of the date of this Brief, has raised no objection. (Furrer Decl. ¶¶ 4, 8; see ECF No. 42 at 3.) KRSM, for its part, has told this Court that it "take[s] no position in this report on the name on any account." (ECF No. 42 at 5.) A movant that declines even to claim the account cannot claim a personal right in the account's records. And the resulting dilemma is entirely of Defendants' making, with either argument horn defeating the Motion: if the 7805 account is KRSM's, as KRSM promised in the EFT Authorization designating it for Mansfield's drafts, then its records are core merits discovery into the account KRSM itself placed at the center of the parties' dealings. If, instead, the account belongs to Universal Group Company, Inc., then KRSM has no cognizable interest in another entity's bank records, and the one person who might is a subpoena recipient that has also not yet objected. What KRSM may not do is wield the very titling anomaly the subpoena investigates, a Court-restrained account promised to Mansfield as KRSM's, but held in a non-party's name, as a standing shield against discovery into it.

**C. Rule 45(a)(4) was honored to the letter, and then some: Defendants received notice, copies, and a pre-service opportunity to object that the Rule does not even require.**

Rule 45(a)(4) provides that if a subpoena commands pre-trial production, "then before it is served on the person to whom it is directed, a notice and a copy of the subpoena must be served on each party." Fed. R. Civ. P. 45(a)(4). Its purpose is to afford other parties an opportunity to object. See, also, the Sedona Conference *Commentary on Rule 45 Subpoena to Non-Parties*, 2nd, Ed.,https://www.thesedonaconference.org/sites/default/files/publications/Rule%2045%20 Commentary%20revised%202nd%20public%20comment%20%284%29.pdf ("this requirement was emphasized and enhanced to require providing other parties with a copy of the subpoena due to "frequent fail[ure] to give the required notice to the other parties." The amendment is "intended to achieve the original purpose of enabling the other parties to object or to serve a subpoena for additional materials." The Rule and commentary are clear: notice first, service second. They impose nothing more: no minimum interval, no pre-service veto, and no requirement that the issuing party stand down until an objecting party is satisfied. The mechanism the Rules give an objecting party is a motion under Rule 45(d)(3) or Rule 26(c). The mechanism they give an objecting recipient is a written objection under Rule 45(d)(2)(B) after service.

A party's request that service be "held" pending negotiation is a courtesy that may be asked for, but not an entitlement that the Rules confer. Defendants themselves have conceded as much, in their own filing: in the Rule 26(f) Report they asked the Court to require notice "seven days **beyond what Rule 45(a)(4) requires**" before any non-party financial subpoena. (ECF No. 42 at 13 (emphasis added).) One does not propose adding a waiting period to a rule that already contains one. The Court entered its Scheduling Order without adopting that proposal (ECF No. 46), and Defendants cannot obtain by motion, or by false accusation, the pre-service interval the Rule does

not supply and the Court did not order.

Here, the sequence was more than honored. Defendants received the formal notice letter and complete copies of all seven subpoenas on September 17, before service on anyone. Therefore, Defendants have now at least twelve (if not more) days of pre-service opportunity to object, culminating in this fully briefed motion, with no recipient yet commanded to produce anything. Defendants have received, in practice, a more protective procedure than the one they accuse Plaintiff of denying them. Their Rule 45(a)(4) grievance is self-refuting. Nor can Defendants claim they were left guessing at Plaintiff's position: it was stated to them in writing, together with an open invitation to call, office or cell, "over [the] weekend" included. (Defs.' Ex. E, ECF No. 51-1 at 74.) No call came before the September 21, 2026, conference. (Santarelli Decl. ¶¶ 6–7.)

The September 11, 2026, episode does not change the analysis; it confirms it. When the first-round notice defect was raised on September 16, Plaintiff's counsel conceded it in writing the same day, withdrew every affected subpoena effective immediately, committed to sequester unreviewed anything received, sent written withdrawals to the recipients by email and FedEx the next morning, and promised, and then delivered, full Rule 45(a)(4) notice before any re-service. (Defs.' Exs. A–B, ECF No. 51-1 at 1–5.) That is what the Rules contemplate when an error occurs: prompt, complete cure. A withdrawn subpoena from one round supplies no basis to suppress different, fully compliant subpoenas from another. Especially subpoenas that still have not been served.

### D. The subpoenas seek discovery squarely within Rule 26(b)(1): they trace the fuel, the proceeds, and the account this Court has already restrained, following the map the Court itself drew.

Parties may obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The

Motion's premise, a bare price dispute in which nothing matters but Mansfield's invoices, or "an accounting dispute" as counsel said during the TRO hearing, is irreconcilable with the pleadings and with this Court's own findings. The Complaint pleads conversion and unjust enrichment alongside the contract claims. (ECF No. 1.) The Court has already found, on the evidence, that a meaningful quantity of the fuel "went to ... gas stations operated by or affiliated with the defendant," which "have already realized a benefit" (Hr'g Tr. 170); that "tankers dispatched by [Mr. Kazmi], or his brother, or affiliated entities" did the tapping (Hr'g Tr. 171); and that Mansfield holds an equitable interest in an account now at "genuine risk" from "other creditors" holding "other judgments" (Hr'g Tr. 174). Where Mansfield's fuel went, who received it, who resold it, and who pocketed the proceeds are elements of pleaded claims, and are not, despite Movant's assertion, "asset discovery." And it is KRSM itself that raised quantity and billing accuracy in issue. Its consistent position, credited by the Court only to the extent of a $1 million dispute (Hr'g Tr. 172), makes the bills of lading, delivery tickets, and dispatch records held by the carriers the best evidence of what was actually lifted and delivered. Discovery that proves or disproves a defendant's own defense is the core of Rule 26(b)(1).

Nor can Defendants contend that because title to the fuel passed at the rack under 13 Pa. C.S. § 2401, everything downstream is "a fact about someone else's property" and off-limits as counsel stated in his September 21, 2026 correspondence (Defs.' Ex. F, ECF No. 51-1 at 87, 2(c)). That argument confuses the merits of one count with the scope of discovery on all of them. The unjust-enrichment claim measures the benefit Defendants realized, and this Court has already found, on the evidence, that a meaningful quantity of the fuel went to affiliated stations that "have already realized a benefit." (Hr'g Tr. 170.) Where the fuel went and on what terms it was resold is how that benefit is proven and measured, whatever the technical locus of title. Delivery-side

records also complete the quantum proof that Defendants concede is discoverable, split loads, delivery confirmations, and the identity of who directed each drop, and identify the principals for whom the carriers acted. And, whether the conversion count survives will be the subject of Defendants' expected Rule 12 motion; a defendant does not get to pre-litigate its motion to dismiss by shrinking Rule 26(b)(1) to the counts it wishes remained.

***i. The carrier and delivery discovery (MR3, Windson, Freedom Fuel).***

The MR3 and Windson subpoenas seek bills of lading, delivery confirmations, split-load detail, dispatch instructions, hauling invoices and the identity of who paid them, and communications concerning the Mansfield fuel, together with one narrow, pointed request (Request 8) for any instruction from any Kazmi Party "to alter, withhold, or discard records" of those deliveries. Defendants' own proposed order concedes the relevance of the terminal loading data and of Request 8. (Proposed Order ¶ 2.) The rest of the requests are similarly relevant. Request 6, the retail locations to which the carriers delivered fuel for any Kazmi related entity during the nine-month Relevant Period, and the supplier account from which each load was lifted, is how Mansfield distinguishes its fuel from anyone else's at the same stations, tests KRSM's invoicing defense, and traces the converted product to the affiliated stations the Court has already described. Request 4 (carrier agreements and credit applications with Kazmi Parties[1]) identifies who directed and paid for the hauling, the agency and control facts that connect KRSM and other Kazmi related entities to the product. The carrier data already obtained shows why this matters: nearly half of the tracked gallons were delivered to stations published as part of the "Freedom Fuel Network," an entity believed to have been formed on June 23, 2026, mid-way through the six-week lifting period. (Furrer Decl. ¶ 10.) The Freedom Fuel subpoena's station, contract, pricing, and capitalization

[1] Kazmi Parties includes the Defendants, Shamikh Kazmi and all related entities.

requests ask the obvious next questions: which stations received Mansfield's fuel, on what terms it was resold, at whose direction, and with whose money. The request for communications publicly touting the source and below-cost pricing of that fuel (FFN Request 13) is expressly limited to communications "referenc[ing] the identity of any fuel supplier or the cost of fuel," statements about the very product at issue.

***ii. The M&T Bank discovery.***

The M&T subpoena is anchored to the "Subject Account", the 7805 account KRSM designated to Mansfield in 2022, the account the Court described as "the gateway that opened up access to gasoline" (Hr'g Tr. 173), and the account the Court has twice restrained. Its categories map onto live issues: (i) title (Request 1), the bank has advised that the restrained account is titled to a non-party entity, and the identity and title history of the account (reaching back to KRSM's January 2022 designation of it) to determine who controls the res of the Court's injunction; authorized users and audit logs (Request 2), who initiated each transfer out, which the Motion mislabels a demand for "online-banking credentials" (see Part III.D.v); transactions and daily balances (Requests 3 and 5), the flows that will prove or disprove the dissipation the Court found to be a genuine risk, and that the pending contempt motion will require in any event; the refused ACH drafts of July 27–28 (Request 4), core breach evidence, conceded by Defendants' own proposed order (¶ 2(b)); the bank's receipt of and compliance with the Court's orders and any post-freeze withdrawal requests (Request 6), conceded as well (¶ 2(c)) and directly probative on contempt; related accounts and inter-account transfers (Requests 7–8), accounts held by, signed for, or transacting with the Kazmi Parties, which is how nearly four million dollars of proceeds are traced if, as the record suggests, they did not stay in the designated account; credit files (Request 9), the financial statements KRSM and its affiliates submitted to the bank are party admissions of

financial condition, squarely relevant to any inability-to-comply defense and to the reliability of the December 2023 statement (Ex. 3) showing $30.9 million in cash; and bank–customer communications about Mansfield, this action, and the Court's orders (Request 12). This is not an "inventory" of strangers' assets; it is the audit trail of the specific account the Court restrained and of the transfers touching it, during a Relevant Period beginning January 1, 2026, twenty weeks before the first load at issue was lifted.

***iii. The entity and transfer discovery (Universal Group, Universal Property Services, Shamikh Kazmi).***

The entity subpoenas seek formation and ownership documents, account identification, transfers of value with other Kazmi Parties, Mansfield-fuel documents, station lists, and, for the two Universal entities, ledgers and reconciliations for the Relevant Period. The record ties these entities to the case concretely: the Court found that the tapping was done by tankers dispatched by Mr. Kazmi, "or his brother, or affiliated entities" (Hr'g Tr. 171); the restrained account is titled to a non-party; the defense correspondence in this action issued from legal@upssites.com, the same domain as the accounting address KRSM supplied on its own credit application, a domain associated with Universal Property Services; and the carrier data places the fuel at stations in a network whose formation, ownership, and financing are precisely what the subpoenas ask about.

Similarly, transfers of value between KRSM and these entities during the period the debt accrued and the injunction has been in place are relevant to conversion and unjust enrichment now, to the contempt record now, and to the fraudulent-transfer amendment Plaintiff has told the Court it will seek, for which the essential missing fact is the identity of transferees. Proportionality follows from the same facts: the Relevant Period is short, the definitions are tied to identified persons and entities, and any genuine burden objection belongs to recipients who, not yet having been served, have raised none. Defendants' remaining scope points (Defs.' Ex. F, ECF No. 51-1

at 91–93) fare no better: the "Kazmi Affiliated Entities" definition enumerates five named entities before its catchall, so every recipient can answer as to the named entities and its own records; and the temporal objection ignores that tracing payment for fuel lifted through July 7, 2026 necessarily runs past July 7, 2026, the proceeds moved, if at all, afterward, while the single pre-2026 reach-back concerns only the title history of the one account KRSM designated in January 2022.

***iv. Grupo Mexicano is a remedies case and this Court has already held that this case falls within its exception.***

The Motion's legal centerpiece is *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), recast as a rule of discovery. It is no such thing. *Grupo Mexicano* addressed a district court's equitable power to enjoin a debtor's use of unrelated assets before judgment where the creditor asserted only legal claims; it says nothing about Rule 26(b)(1), which measures discovery by relevance to claims and defenses, and conversion and unjust enrichment are pleaded claims whose proof is the movement of the fuel and its proceeds. More fundamentally, Defendants already litigated *Grupo Mexicano* in this Court, in support of vacating the TRO, and lost. Ruling from the bench, the Court has already held that "this falls within the exception to Grupo de Mexico," citing the Supreme Court's endorsement of *Deckert* and the Third Circuit's decision in *Hoxworth*, 903 F.2d 186, because Mansfield holds an equitable claim with a specific nexus to an identifiable asset. (Hr'g Tr. 170–73.) Because the Court has already ruled that '"this falls within the exception to Grupo de Mexico," that is the law of the case and as "a prudential principle, law of the case holds that a rule of law announced in a **case** should later be applied to "the same issues in subsequent stages in the litigation."' *Saint-Jean v. Palisades Interstate Park Comm'n,* 49 F.4th 830 (2022), citing *In re Resyn Corp.*, 945 F.2d 1279, 1281 (3d Cir. 1991) (quoting *Devex Corp. v. Gen. Motors Corp.*, 857 F.2d 197, 199 (3d Cir. 1988)). Whatever *Grupo Mexicano* might mean for a general creditor with no interim relief, it does not mean that a plaintiff

who holds a preliminary injunction, entered on findings of an equitable interest and a genuine dissipation risk, is forbidden discovery into the restrained account, its true titleholder, and the transfers that left it $2.16 million below the Court-ordered floor.

The Rule 69 argument similarly fails for the same reason it failed in Defendants' own authority: Plaintiff does not invoke Rule 69(a)(2), and *Talentscale*, *supra*, does not erect a pre-judgment discovery bar, but denied the debtor's motion and let the non-party discovery proceed. The Motion's scope arguments are also not new to this Court: they restate, nearly category for category, the Rule 16(b)(3)(B)(ii) scope order Defendants proposed in the Rule 26(f) Report, which would have excluded non-party accounts and corporate structure, downstream destinations and resale proceeds, and "[a] general tracing of funds" (ECF No. 42 at 11–12), and which the Court, stating that it could "discern no reason to stage or limit discovery," declined to enter. (ECF No. 46 n.1.) A scope regime the Court considered and did not adopt at scheduling does not become the law of the case because it is refiled as a motion to quash.

***v. The Motion's remaining points mischaracterize the requests.***

Two examples illustrate the Motion's method. First, it repeatedly asserts that Plaintiff demands "online-banking credentials," conjuring a demand for passwords. (Mot. at 2, 11, 15.) Request 2 asks for "Documents identifying every person authorized ... to sign on, transact in, or access the Subject Account, including online-banking user credentials and audit logs sufficient to show who initiated each transfer out of the Subject Account." The object is identity and attribution, who moved the money, not access codes. To eliminate any doubt, Plaintiff confirms on the record that it does not seek passwords, PINs, security questions, tokens, or similar authentication data, and that M&T may redact them from any responsive document (although, realistically, M&T would never provide such information).

Second, the Motion accuses Plaintiff of demanding "suspicious-activity reports." (Mot. at 2.) Request 11 says the opposite on its face: it seeks compliance materials only "to the extent production is not prohibited by 31 U.S.C. § 5318(g)(2)" and expressly directs that, where a document is SAR-related, the bank produce only "the underlying transactional records, which are not privileged." A motion that must misdescribe the requests to make them sound abusive has conceded that their actual content is not.

**E. The privilege objection fails: the requests target the provenance of documents the sworn record has already placed in a non-lawyer's hands, and fee, engagement, and ECF-access records are not privileged.**

The Motion leads with Requests 8–13 of the Shamikh Kazmi subpoena and Requests 6–7 of the Universal Property Services subpoena, describing them as a raid on "the defense's own litigation file." What the requests actually seek is the provenance of specific documents: the August 10, 2026 letters sent by Shamikh Kazmi to Mansfield over Mr. Gossett's name, the defense filings at ECF Nos. 25 through 27, the identity of who drafted, reviewed, approved, and filed them, communications with Mr. Gossett, his engagement and payment, and the use of his CM/ECF and PACER credentials and of the legal@upssites.com mailbox. Those subjects are in this case because Mr. Gossett testified about them, under oath, in open court, called by the defense. He testified that the August 10, 2026, letter "was drafted by Mr. [Shamikh] Kazmi"; that he believed Shamikh Kazmi to be a New Jersey attorney, an assumption the Court noted on the record is contradicted by the attorney rolls of New Jersey and Pennsylvania; that he never reviewed the invoices and could not certify the letter's contents; and that the notice of appearance filed "through my account" was not prepared by him and bore a telephone number that is not his. (Hr'g Tr. 130–35, 139–41.) The Motion litigates these requests as though that testimony did not occur.

The privilege analysis follows settled law. First, the party asserting privilege must establish

it, communication by communication; blanket invocations do not suffice. *Frankford Trust Co. v. Advest, Inc.*, 1996 U.S. Dist. Lexis 14879 (ED. Pa. 1996) (The party asserting the work product privilege must establish the necessary elements"). The Motion identifies no specific communication and offers no log, only the assertion that any document "concerning" the filings must be privileged.

Second, the attorney-client privilege protects confidential communications between counsel and the client, here, KRSM and Syed Kazmi. Shamikh Kazmi is neither. Communications shared with, or generated by, a third person outside the privileged relationship are not confidential, and disclosure to such a person waives whatever protection existed. *C&S Wholesale Grocers, Inc. v. Gerrity's Super Mkt., Inc.*, 2023 U.S. Dist. Lexis 154827 (MD. Pa. 2023). If KRSM's position is that Shamikh Kazmi was so integrated into the defense that his communications are privileged, that is a claim to be established with evidence, with a privilege log, not assumed, and such an argument would not now be believable following the TRO testimony that Syed Kazmi didn't know who his business partners were and that Syed Kazmi was held out as an attorney that the public rolls do not list. Third, the identity of who drafted, reviewed, approved, or filed a document is a fact, not a communication. Engagement, payment, and fee-arrangement records are, as a general rule, not privileged. *Ross v. EQT Corp.*, 2025 U.S. Dist. Lexis 273772 (WD. Pa. 2025)

Fourth, to the extent any communication was in furtherance of the unauthorized practice of law or of a fraud on this Court, the crime-fraud exception strips it of protection in any event. *In re Grand Jury Subpoena*, 705 F.3d 133, 151–55 (3d Cir. 2012).] Fifth, the assertion is unsupported in the manner the law requires. No affidavit or declaration accompanies the Motion identifying the attorney whose advice is at issue or the client who holds the claimed privilege. No capacity is established for Shamikh Kazmi that could bring him within anyone's privilege: the Motion does

not identify him as a client of any counsel of record, as an officer or employee of KRSM, or as personnel of any attorney or law firm, and communications between Shamikh Kazmi and Syed Kazmi, neither of whom is a lawyer admitted in New Jersey or Pennsylvania so far as those states' rolls reflect (Hr'g Tr. 139–40), are not attorney-client communications at all. Sixth, Defendants have placed the letters' contents at issue. Their counsel told the Court at the hearing that what matters about the August 10, 2026 letters is whether they "contain[ed] a detailed objection that the corporation actually had" and were "formally conveyed" to Mansfield. (Hr'g Tr. 139.) Defendants thus proffer the letters as the corporation's own statement of its factual objections, the alleged merits of their defense. Having done so, they cannot shield the letters' acknowledged author, the sources of the "detailed" facts he compiled, or the documents from which he worked. On the sworn record, that author reviewed the letters with counsel only at the level of "a general overview ... in terms of the actual particulars of it no" (Hr'g Tr. 141), which makes him what he is: a fact witness in personal possession of the facts on which Defendants' asserted defenses rest. Discovery of where those facts came from and what evidence supports them is discovery of the merits of this case, not of privileged communications.

Movants rely on *Sporck v. Peil*, 759 F.2d 312 (3d Cir. 1985); however, that matter does not carry the weight the Motion places on it. *Sporck* protects opinion work product, counsel's selection and compilation of documents, revealing counsel's strategy and evaluation. Nothing in these requests asks any attorney to reveal a selection, a strategy, or a mental impression. They ask who created and filed identified documents, documents that, on the sworn record, were generated by someone the drafter's own supervising attorney merely "assum[ed]" to be a lawyer. A doctrine that exists to protect the adversary process is not a shield for its circumvention. And if, in responding, a recipient identifies a genuinely privileged attorney-client communication between

the Defendants and Mr. Gossett, the Rules supply the answer: a privilege log under Rule 45(e)(2)(A), which each Schedule A expressly instructs (Instruction 4), followed, if necessary, by a targeted review. Wholesale suppression of provenance discovery, at the request of a movant whose burden is unmet, as to subpoenas not yet even served, is not the remedy.

**F. The proposed order overreaches; if anythingmodification, not quashing, is the proper tool, and confidentiality belongs to the recipients.**

Even on its own terms, the relief Defendants propose is extraordinary. Paragraph 2 of the proposed order would quash concededly proper categories, the terminal loading data, two M&T requests, and the carriers' anti-spoliation request, only to permit Plaintiff to "reissue" them: a pure make-work attempt with no protective function, directed at subpoenas that have not been served in the first place. Paragraph 3 would enjoin Plaintiff, prospectively and indefinitely, from "issuing any discovery on third parties concerning the business operations of any third party unless that activity involves or includes KRSM," an advance restraint on discovery not yet propounded, untethered to any rule, which on its face would forbid even discovery concerning Defendant Syed Kazmi's own dealings, and which is difficult to square with a scheduling order stating that the Court "can discern no reason to stage or limit discovery." (ECF No. 46 n.1.) Paragraph 4 would award $5,000 in fees that the supporting memorandum itself declines to quantify, promising a "supplemental submission" instead. (Compare Proposed Order ¶ 4 with Mot. at 17.) Rule 45(d)(3)(A) directs courts to "quash or modify"; where a request is thought too broad, the proportionate response is to narrow it, on a motion by someone with standing to complain, not to strike seven subpoenas wholesale. And to the extent any recipient, once served, has genuine confidentiality concerns about financial records, Plaintiff is prepared to negotiate a reasonable confidentiality stipulation with that recipient, the person to whom such protections belong, or to abide any standard confidentiality order the Court deems appropriate. What the Court should not

do is award KRSM, through a protective order, the suppression of third-party discovery it lacks standing to prevent.

**G. The sanctions request should be denied: the asserted "misrepresentation" was a true statement, and "service" did not occur before the Motion was filed.**

The fee request fails with the very premise it is based on. Every sanctions theory in the Motion, Rule 45(d)(1), 28 U.S.C. § 1927, Rule 26(g)(3), and the Court's inherent power, depends on the same factual assertion: that Plaintiff's counsel represented in writing that the subpoenas "have not been served and are not in the process of being served," and "then served all seven the same day."[2] (Mot. at 3, 14.) The first half of that sentence describes a true statement; the second half describes an event that never happened. To be specifically clear, at 9:52 a.m. on September 18, Mr. Toner asked Plaintiff's counsel's office to "confirm that none of the subpoenas . . . have been issued or sent for delivery." At 9:54 a.m. — two minutes later — he received the requested confirmation: "They have not been served and are not in the process of being served." (Defs.' Ex. D, ECF No. 51-1 at 62.) That was accurate when written, and it has been accurate every day since, because, as of September 28, 2026, no subpoena had been served on any recipient. (Furrer Decl. ¶ 4.) At 10:22 a.m., Mr. Santarelli e-mailed Defendants' counsel and wrote "Paul—what rule are suggesting is or may be violated here? You have received notice of these third party subpoenas prior to service. Let me know what rule you refer to this time. Thanks." (Defs.' Ex. G, ECF No. 51-1 at 95–109.) At 12:01 p.m., still having received no response from Mr. Toner, Mr. Santarelli e-mailed Mr. Toner again, stating that (Santarelli Decl. ¶¶ 4–5):

> even if they are not formally served at this time, there is no reason to delay any further in serving these third party subpoenas in the meantime.

[2] It is submitted that even if Plaintiff has stated that the subpoenas had not been served, and are not in the process of being served, Plaintiff's subsequent service of those subpoenas would not violate any rule so long as Defendants' counsel was notified that service had been completed. Once again, Rule 45(a)(4) and its commentary are clear: notice first, service second. They impose nothing more: no minimum interval, no pre-service veto, and no requirement that the issuing party stand down until an objecting party is satisfied.

> We'll certainly also talk to you about whatever concern you seem to have (but have not expressed to me at least). But under the rules as I know them, whatever "objection" you may have to a subpoena on a third party, it does not delay serving third party subpoenas under the rules. If you are suggesting otherwise, by all means let me know what rule.
>
> Given Judge McHugh's clear direction that we proceed promptly, and his tight schedule he issued in the order, as well as his express disagreement with your request that there be "staging or limits" on discovery, we have to get the discovery process moving so there are no needless delays. I understand your clients may have a different agenda to delay, obstruct or protract discovery, but please understand I don't want to go along with that program, including because Judge McHugh already considered and rejected what you were seeking in that regard in the Rule 26f report; and, we have a tight discovery period for this case and we need to not let obstructions and delays by or on behalf of Kazmi/your clients prejudice the court's ordered schedule.
>
> After the subpoenas are served, we'll let you know.
>
> And by all means if you want to talk in the meantime, feel free to call my office or on cell 267-825-3403...I'm here all day and don't mind you calling over weekend either. Thanks and have a nice weekend if we don't talk otherwise.

That September 18, 2026 e-mail on which the Motion also relies said the opposite of what the Motion needs it to say: it announced that "there is no reason to delay any further in serving these third party subpoenas" and that "[a]fter the subpoenas are served, we'll let you know." (Defs.' Ex. E, ECF No. 51-1 at 74.) A statement of intent to serve is not a statement of service; no "served" notification was ever sent; and the Motion attaches no proof of service because none exists. Importantly, Mr. Toner did not respond to either of Mr. Santarelli's emails until Monday, September 21, 2026, at 12:01 p.m.

Furthermore, Exhibit F removes any possibility of good-faith mistake: on September 21, 2026, the day before this Motion, Mr. Toner acknowledged in writing "your confirmation that the subpoenas have not been served" and asked that service be held "through October 2, 2026." (Defs.' Ex. F, ECF No. 51-1 at 87.) The Motion's contrary assertion, and the Local Rule 26.1(f)

certification built on it, was made with the movant's own contradicting document attached to it.

On this record, the individual sanctions theories and arguments require little discussion. Rule 45(d)(1) protects "a person subject to the subpoena" from undue burden or expense; no person is subject to any subpoena, no recipient has claimed burden, and KRSM cites no authority awarding a party Rule 45(d)(1) fees for burdens borne by no one. Section 1927 requires conduct that multiplies proceedings "unreasonably and vexatiously" and, in this Circuit, a finding of bad faith. *Prosser v. Gerber*, 777 F.3d 155 (3rd Cir. 2015).

However, to seek sanctions where the Plaintiff have Defendant's counsel the notice that Rule 45(a)(4) requires and then not serving while the parties conferred is the opposite of vexatious multiplication. Indeed, the only filing that multiplied these proceedings is Defendants' Motion itself. Finally, for a Court to use its inherent power to sanction Plaintiff's counsel requires bad faith found with specificity, *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), a finding that this record cannot support against Plaintiff, whatever it might suggest about the Motion.

The chronology, finally, cuts precisely against the party invoking it. KRSM's counsel proposed and confirmed a meet-and-confer (Defs.' Ex. G, ECF No. 51-1 at 95–109; Mot. at 5); the parties conferred with Plaintiff's counsel by video on September 21, 2026, in a discussion conducted on the understanding that the subpoenas had not been served (Santarelli Decl. ¶¶ 10, 12); and then filed this Motion on September 22, 2026, asserting as fact, and certifying under Local Rule 26.1(f), that Plaintiff had "served the subpoenas notwithstanding KRSM's request that service be held."

Plaintiff asks only that the Motion be denied and reserves all rights with respect to the Motion's factual assertions and certifications. The Rules prescribe the vehicles and procedures for anything more, and a discovery opposition is not one of them. As for the Motion's effort to pad its

"pattern" with recycled accusations concerning the TRO application, the Rule 11 correspondence, and the ECF 44 docket text: each has been addressed in the record where it belongs, none has been found by this Court to be a misrepresentation, and none is enlarged by its repetition in a discovery motion.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant KRSM Inc.'s Motion in its entirety, including its requests for a protective order and for attorneys' fees and costs; confirm that Plaintiff may serve the September 17, 2026 subpoenas and proceed with discovery in accordance with the Scheduling Order (ECF No. 46); and grant such other and further relief as the Court deems just and proper.

Dated: September 29, 2026

Respectfully submitted,

*/s/ Urs Broderick Furrer*
Urs Broderick Furrer, Esq.
Harriton & Furrer, LLP
Attorneys for Plaintiff
83 Wooster Heights Road, Suite 125
Danbury, Connecticut 06810
(914) 730-3400
UBFurrer@HFLawLLP.com
PA Bar # 312832

Frederick P. Santarelli
Elliott Greenleaf, P.C.
Attorneys for Plaintiff
925 Harvest Drive, Suite 300
Blue Bell, Pennsylvania 19422
(215) 977-1024
FPSantarelli@elliottgreenleaf.com
PA Bar # 53901

Kyle M. Elliott
Elliott Greenleaf, P.C.
Attorneys for Plaintiff
925 Harvest Drive, Suite 300
Blue Bell, PA 19422
(215) 977-1043
kme@elliottgreenleaf.com
PA Bar # 306836

*Counsel for Plaintiff Mansfield Oil Company of Gainesville, Inc.*

# CERTIFICATE OF SERVICE

I certify that on September 29, 2026, I caused the foregoing Opposition to Motion to Quash to be filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record, and to be served by electronic mail upon Paul Toner, Esq., Toner Law Group, PLLC, paul@tonerlaw.com; Mauro Tucci, Esq., Chiesa Shahinian & Giantomasi PC, mtucci@csglaw.com; and georgegossettjr@gmail.com, counsel for the Defendants.

Dated: Danbury, Connecticut
September 29, 2026

/s/ Urs Broderick Furrer
Urs Broderick Furrer, Esquire